**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| JANE DOE and JOHN DOE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> GREATER BETTER HEALTH, INC. d/b/a BERRY STREET HEALTH, INC., <br><br> Defendant. | Civil Action No. _____ <br><br> **COMPLAINT – CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs Jane Doe and John Doe bring this class action against Greater Better Health, Inc. d/b/a Berry Street Health, Inc. ("Berry Street" or "Defendant") in their individual capacity and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions, their counsel's investigation, and upon information and belief as to all other matters, as follows:

## I.   NATURE OF THE ACTION

1.   Defendant is a telehealth and telenutrition platform entrusted by consumers to match them with a dietician for nutrition counseling through https://www.berrystreet.co/ ("Defendant's Website" or the "Website").

2.   Plaintiffs bring this case to address Defendant's outrageous, illegal, and widespread practice of divulging Plaintiffs' and Class Members' confidential

1

personally identifiable information ("PII") and protected health information ("PHI") (collectively referred to as "Private Information") to Meta Platforms, Inc. ("Meta").

3.      Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.      Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to a third party without express written authorization.

5.       Defendant created a confidential physician-patient relationship with Plaintiffs and Class Members by holding itself out as a medical provider, collecting Private Information for the purpose of diagnosis and treatment, and facilitating appointments with licensed medical practitioners, thereby giving rise to duties of confidentiality, trust and loyalty inherent in the physician-patient relationship.

6.       Plaintiffs and Class Members used Defendant's Website with the reasonable expectation that they were communicating privately and confidentially with their trusted healthcare provider. Unbeknownst to them, Defendant deliberately embedded the Meta Pixel, operated by Meta ("Meta Pixel")[1], into its patient-facing website. Through this device, Defendant surreptitiously intercepted and transmitted to Meta extraordinarily sensitive patient information, including patients' identities and the specific medical conditions or treatment they were seeking. This unauthorized disclosure of confidential medical information was made without consent and in flagrant disregard of Defendant's legal duties, privacy obligations, and the most fundamental expectations of patient confidentiality.

7.       Defendant's conscious disregard for its duty to safeguard the identities and highly sensitive medical information of patients seeking treatment directly caused Plaintiffs and Class Members to suffer a profound invasion of

---

[1] Previously known as the "Facebook Pixel."

privacy and loss of confidentiality in their most personal health matters.

8.      Plaintiffs seek to remedy these harms and bring causes of action for: (1) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511—unauthorized interception, use, and disclosure; (2) negligence and negligence per se; (3) breach of fiduciary duty; (4) breach of confidence; (5) breach of implied contract; (6) unjust enrichment; (7) invasion of privacy; (8) violations of the Florida Security of Communications Act, Fla. Stat. § 934.01, et seq.; and (9) violations of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq.

## II.    PARTIES

### a.  Plaintiff Jane Doe

9.      Plaintiff Jane Doe is a natural person and, now and at all other times relevant to this action, is a citizen of Florida where she intends to remain.

10.     Jane Doe's health insurance provider referred her to Defendant for medical treatment. Jane Doe reasonably believed Defendant was a qualified and secure healthcare provider.

11.     On numerous occasions, Jane Doe accessed Defendant's Website on her mobile device and/or computer to find and obtain medical treatment. At all relevant times, Jane Doe also had an active Meta account.

12.     During Jane Doe's interactions on Defendant's Website, as described further herein, Defendant shared with Meta Jane Doe's entire browsing experience

4

including page views, button clicks, add to cart events and answers to onboarding questions including reason for visit, secondary reason for visit, and service desired.

13.    Along with these transmissions, as described further herein, Defendant also disclosed to Meta information sufficient to allow them to identify Jane Doe as the person receiving medical care and scheduling appointments, including user IDs, cookies, device identifiers, and IP addresses.

14.    Defendant transferred this Private Information without Jane Doe's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

### b. Plaintiff John Doe

15.    Plaintiff John Doe is a natural person and, now and at all other times relevant to this action, is a citizen of California where he intends to remain.

16.    John Doe's health insurance provider referred him to Defendant for medical treatment. John Doe reasonably believed Defendant was a qualified and secure healthcare provider.

17.    On numerous occasions, John Doe accessed Defendant's Website on his mobile device and/or computer to find and obtain medical treatment. At all relevant times, John Doe also had an active Meta account.

18. During John Doe's interactions on Defendant's Website, as described further herein, Defendant shared with Meta John Doe's entire browsing experience including page views, button clicks, add to cart events and answers to onboarding questions including reason for visit, secondary reason for visit, and service desired.

19. Along with these transmissions, as described further herein, Defendant also disclosed to Meta information sufficient to allow them to identify John Doe as the person receiving medical care and scheduling appointments, including user IDs, cookies, device identifiers, and IP addresses.

20. During this same period, Defendant deployed the Meta Pixel through which Meta received Plaintiffs' PHI, including the specific reason why they were seeking medical treatment. Defendant shared with Meta the entire browsing experience including page views, button clicks, add to cart events and answers to onboarding questions including reason for visit, secondary reason for visit, and service desired.

21. Defendant transferred this Private Information without John Doe's knowledge, consent, or express written authorization. By failing to receive the requisite consent, Defendant breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

c. **Defendant Greater Better Health, Inc.**

6

22.     Defendant Greater Better Health, Inc. d/b/a Berry Street Health, Inc. is incorporated in Delaware and has a principal office and place of business located at 19 West 24th Street, 4th Floor, New York, NY 10010.[2]

23.     Defendant reports providing medical services for clients in 73 cities nationwide, treating over 100,000 unique patients and over 30 different dietitian related conditions with a 75% weight loss reported within 90 days.[3]

24.     Defendant is a covered entity under the Health Insurance Portability and Accountability Act of 1996 (42 U.S.C. § 1320d and 45 C.F.R. Part 160-45 C.F.R. Part 162, and 45 C.F.R. Part 164 (HIPAA)).

25.     Defendant recognizes its duties under HIPAA in the "Our Policies at Berry Street, HIPAA Notice of Privacy Practices," viewable when signing up.[4]

26.     Defendant acknowledges that it is "legally required to maintain the privacy of your protected health information ("PHI")."[5] Further, Defendant states



**88 Berry Street**                                                          ☰

- Share information in a disaster relief situation, such as to a relief organization to assist with locating or notifying your family, close friends, or others involved in your care.
- If you are not able to tell us your preference, for example if you are unconscious, we may share your information if we believe it is in your best interest, according to our best judgment. We may also share your information when needed to lessen a serious and imminent threat to health or safety.

**In these cases, we will not share your information unless you give us your written permission:**
- Marketing purposes
- Selling or otherwise receiving compensation for disclosing your PHI.
- Other uses and disclosures not described in this NPP.

---

[2] https://www.berrystreet.co/privacy (last visited April 7, 2026).
[3] https://www.berrystreet.co/enterprise (last visited April 7, 2026).
[4] https://www.berrystreet.co/policy? (last visited April 7, 2026).
[5] *Id.*

that it will not share clients PHI for marketing purposes (shown below). The factual allegations in this complaint show otherwise.

### III.   JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and at least one member of the class is a citizen of a state different from Defendant.

28.    Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

29.    This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges questions of federal law under the ECPA (18 U.S.C. § 2511, et seq., and 18 U.S.C. § 2702).

30.    This Court has specific personal jurisdiction over Defendant Berry Street  because Berry Street has availed itself of the rights and benefits of the State of Florida, including by (1) providing services in this District; (2) targeting members of this District for subscription; (3) conducting substantial business in

8

this District, including, but not limited to, business with Plaintiff Jane Doe, and (4) perpetuating unlawful acts in this District.

31.    Berry Street provides services to Florida residents through clinicians that are based within the State of Florida, including in Tampa, Florida. As such, Berry Street anticipated that it would be subject to the laws of the State of Florida when it offers services provided within the State of Florida to Florida residents. Berry Street directly targets consumers in Florida in attempt to earn their business through online advertisements on various platforms, including Meta.

32.    Defendant's Website clearly represents that it provides services to patients in Florida, including specifically in the Tampa area, thereby purposefully availing itself of the privilege of conducting business within the State of Florida, conducting business in the state, and profiting from services provided to Florida residents.





## How to find a dietitian in Tampa

**1  Match with a dietitian**

Search our easy-to-use online directory of 100+ registered dietitians in Tampa and filter on what matters most to you.

**2  Meet virtually for 1-on-1 nutrition therapy**

Work with an online nutritionist covered by insurance, over video, from the comfort of your favorite Tampa spot.

**3  Covered by insurance**

All of our registered dietitians are in-network, with most clients paying $0 out-of-pocket.

# What patients in Tampa are saying

What makes the Berry Street right for you? Here's what members had to say about their experience with Berry Street.

**Excellent**

Rated 4.9 / 5 based on 864 reviews on  Trustpilot





33.     Venue is proper in this District under 28 U.S.C. § 1391(a)- (d) because a substantial part of the events giving rise to this action occurred in this District, including Defendant's collection and redistribution of Class Members' Sensitive Health Information in this District; and Defendant caused harm to Class Members residing in this District, including Plaintiff Jane Doe.

## IV.    FACTUAL ALLEGATIONS

### A.  Background: Underlying Technology Employed by Defendant for the Purpose of Disclosing Plaintiffs' and Class Members' Private Information.

34. Defendant uses its Website to connect Plaintiffs and Class Members to its digital healthcare platforms with the goal of increasing profitability.

35. In connection with operating its Website, Defendant deliberately embedded the Meta Pixel, a tracking technology developed and operated by Meta, into its patient-facing webpages.

36. The Meta Pixel is code that, when installed on a website, tracks user interactions and transmits those interactions to Meta in real time. As users navigate a website, the Meta Pixel automatically sends information regarding their activity to Meta while the communication between the user and the website is ongoing.

37. In Furtherance of that goal, and to increase the success of its advertising and marketing, Defendant purposely installed the Meta Pixel to many of its webpages within its Website and on its servers, and programmed those webpages and servers. In doing so, Defendant surreptitiously shared patients' private and protected communications with Meta; including communications that contain Plaintiffs' and Class Members' Private Information.

38. Through its implementation of the Meta Pixel, Defendant caused the transmission to Meta of Plaintiffs' and Class Members' Private Information, including but not limited to: pages viewed, button clicks and user inputs,

12

appointment scheduling activity, responses to intake questions, including primary and secondary reasons for seeking care, and requested treatments and services.

39.     These transmissions were accompanied by persistent identifiers—including IP addresses, cookies, and device identifiers—that allow Meta to associate the transmitted information with a specific individual. For example, Meta uses a cookie known as "c_user," which contains a unique identifier assigned to a logged-in Meta account holder. When present, this identifier enables Meta to link a user's activity on Defendant's Website directly to that individual's Meta profile.

40.     As a result, Meta can identify a specific patient and determine that the individual sought medical care, including the type of care requested and the underlying health-related concerns reflected in the patient's interactions with Defendant's Website.

41.     The Meta Pixel is one of Meta's most powerful advertising tools, "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use the Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the

13

effectiveness of [its] advertising by understanding the action people take on [its] website."[6]

42. Despite the Meta Pixel's capabilities, Meta's own terms make clear that its Pixel shall not be used to transmit sensitive health information. Meta expressly states that it does not permit businesses to share "health information…or other categories of information that may be considered sensitive" through its Meta tools. Businesses remain responsible for ensuring their integrations do not transmit such data, and sharing prohibited information violates Meta's terms and may result in restrictions or termination of service.[7]

43. Despite these clear prohibitions, Defendant willfully and intentionally incorporated the Meta Pixel into its Website. Defendant never disclosed to Plaintiffs or Class Members that their confidential communications and Private Information were being transmitted to Meta without their knowledge or consent, and Plaintiffs and Class Members had no awareness that this unauthorized disclosure was occurring.

   i. **Defendant's Methods of Transmitting Plaintiffs' and Class Members' Private Information via the Tracking Pixels i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Pixel**

---

[6] Cecile Ho, Announcing Facebook Pixel, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ (last visited April 7, 2026).
[7] https://www.facebook.com/business/help/361948878201809?id=188852726110565 (last visited April 7, 2026).

44. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accessed web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

45. Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

46. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses. Any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies[8]

47. When an individual visits Defendant's Website, an HTTP Request is sent from that individual's web browser to Defendant's servers that essentially asks Defendant's Website to retrieve certain information (such as Defendant's "Start Today" page). The HTTP Response from Defendant's servers sends the requested information in the form of "Markup." This is the foundation for the

---

[8] "Cookies are small files of information that a web server generates and sends to a web browser. …Cookies help inform websites about the user, enabling the websites to personalize the user experience."
https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited April 7, 2026).

pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website.

48.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

49.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Defendant's customized implementation of the Meta Pixel is source code that does just that. The Meta Pixel acts much like a traditional wiretap. When patients visit Defendant's Website via an HTTP Request to Defendant's server, its server sends an HTTP Response including the Markup that displays the Webpage visible to the user along with Source Code that includes Defendant's Meta Pixel. This Source Code is then stored in the user's RAM on the user's device.

50.     In essence, Defendant is handing patients a bugged phone. Once the Webpage loads in the patient's browser, the software-based wiretap quietly waits for a communication from the patient to trigger the tap, which intercepts those communications intended only for Defendant and transmits them to Meta, a third party.

16

51.    Separate from the Meta Pixel, other website owners can place third party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Meta uses this type of third-party cookie when users that are account holders use their app or website. As a result, when a Meta account holder uses Defendant's Website, a unique ID is sent to Meta along with the user's device fingerprint and the intercepted communication that allows Meta to identify the patient associated with the Private Information it has intercepted.

52.    The third parties to whom a website transmits data through the Meta Pixel do not provide any substantive content on the host website. In other words, Meta and others like it are not providing anything to the user relating to the user's communications. Instead, these third parties are typically procured to track user data and communications only to serve the marketing purposes of the website owner (i.e., to bolster profits).

53.    Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Meta.

17

54.    In this case, Defendant employed the Meta Pixel to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Meta.

55.    For example, when a patient visits Defendant's Website and selects the "Start Today" button, the patient's browser automatically sends an HTTP Request to Defendant's web server, which automatically returns an HTTP Response and loads the Markup for that particular webpage as depicted below.



56.    The patient visiting this particular web page only sees the Markup, not Defendant's Source Code or underlying HTTP Requests and Responses.

57.    The Pixels are embedded in Defendant's Source Code sent in its HTTP Response to consumers' client devices and ran on their browsers. The Meta Pixel, programmed to automatically track and transmit the patient's communications with Defendant's Website to Meta, execute instructions that effectively open a

hidden spying window into the patient's browser through which Meta can intercept the visitor's data, actions, and communications with Defendant.

58.    Thus, Defendant's Source Code containing the Meta Pixel manipulates the patient's browser by secretly instructing it to duplicate the patient's communications (HTTP Requests) with Defendant and sends the communications to Meta.

59.    This communication to Meta occurs contemporaneously, invisibly, and without the patient's knowledge.

60.    Thus, without its patients' consent, Defendant has effectively used its source code to commandeer and "bug" or "tap" patients' computing devices, allowing Meta to listen in on all of their communications with Defendant and thereby intercept those communications, including Private Information.

61.    Consequently, when Plaintiffs and Class Members visit Defendant's website and communicate their Private Information, including, but not limited to, button clicks, it is simultaneously intercepted and transmitted to Meta. The type of information shared via the Meta Pixel is shown in the following paragraphs.

### ii.    Button Click Events

62.    When a patient schedules an appointment through Defendant's Website, the patient's responses, captured through "button-clicks" are intercepted by the Meta Pixel.

19

63.    These button-click events capture each interaction the patient makes, including selections such as appointment type, provider specialty, preferred treatment category, and confirmation actions. Upon capture, these events are transmitted in real time to Meta, including Meta's advertising and analytics vendors, along with unique identifiers, IP addresses, device fingerprints, and browser metadata that enable the recipient to associate the interaction with a specific individual or user profile.

64.    Button-click tracking is particularly invasive because it does not merely measure passive website traffic; instead, it records the patient's affirmative selections and decision-making process while seeking medical care. Each click reflects intentional choices revealing the patient's health concerns, treatment interests, and care-seeking behavior. Unlike generalized browsing data, these interaction events can disclose highly sensitive medical information.

65.    For example, when a user interacts with Defendant's Website, they may select options relating to weight management, reproductive health, oncology services, kidney disease, or other confidential treatment categories. These interactions reflect patients' affirmative choices and reveal highly sensitive medical information, including the conditions for which they are seeking care and the types of treatment requested.

66.    This button-click tracking allows third parties to reconstruct a patient's healthcare journey by capturing the precise sequence and timing of selections made during scheduling. When combined with persistent identifiers and cross-device tracking tools, this data enables third parties to link the patient's medical-care inquiries to their broader online identity, social media profiles, and advertising ecosystems. As a result, Meta can infer medical conditions, predict future healthcare needs, and target patients with tailored advertising based on sensitive health-related inferences.

67.    The disclosure of button-click interaction data is particularly harmful because patients reasonably expect that their communications with a healthcare provider, including appointment scheduling selections, will remain private and confidential. Unauthorized interception and transmission of these interactions undermine patient trust, chills individuals from seeking care, and exposes patients to profiling, targeted marketing, and potential discrimination based on inferred medical conditions.

68.    Despite the highly sensitive and confidential nature of this intake information, Defendant configured the Meta Pixel to transmit patients' responses to Meta in real time.

69.    As demonstrated below, when a patient schedules an appointment through Defendant's Website, the patient is required to answer intake questions

21

such as "What's the main reason for your visit?" Nothing in the user interface suggests that these interactions are being tracked, captured, or transmitted to a third party. At the bottom of the intake form, Defendant represents that "All information you share is secure and confidential," alongside "HIPAA Compliant" and "Secure SSL" emblems. In reality, however, each button click capturing those responses is transmitted verbatim to Meta via the Pixel.



*Figure 1: Berry Street intake form displaying the question 'What's the main reason for your visit?' with visit-reason options. Note the 'HIPAA Compliant' and 'Secure SSL' security emblems at the bottom of the page, which appear on every intake screen.*

70.    While the intake questions appear to be part of a confidential scheduling process, the Meta Pixel transmits each corresponding "button click" to Meta along with additional identifying information.



*Figure 1: Browser developer tools view showing Meta Pixel network activity captured during the intake process depicted in Figure 1. Red boxes highlight three areas of transmitted data examined in subsequent figures.*



*Figure 3: Enlarged view of Figure 2's first red box, showing a network request to 'https://www.facebook.com/tr/' – Meta's tracking endpoint – confirming that patient data is being transmitted to Meta's servers.*



```
26  Content-Disposition: form-data; name="cd[buttonFeatures]"
27
28  {"classList":"chakra-button css-xu4hpf","destination":"https://visit.berrystreet.co/onboarding/visit-reasons","id":"",
    "imageUrl":"https://bs-customer-booking-flow.berrystreet.co/reasons-icons/save_file.svg","innerText":"\nWeight Concerns\n",
    "numChildButtons":0,"tag":"button","type":"button","name":"","value":""}
29  ------WebKitFormBoundaryjNnRYq0UPy7Dg3WA
30  Content-Disposition: form-data; name="cd[buttonText]"
31
```

*Figure 4: Enlarged view of Figure 2's second red box, revealing the unique patient identifier parameter 'c_user=863705653' and the destination URL containing 'visit.berrystreet.co/onboarding/visit-reasons…Weight Concerns,' linking the patient's identity to their medical concern.*



*Figure 5: Enlarged view of Figure 2's third red box, showing the captured button-click event data containing the patient's selected visit reason: "Weight Concerns".*

71.    Within the single button-click, Defendant transmits to Meta the patient's identity, the provider of care, and the patient's reason for seeking medical treatment.

72.    This transmitted data is associated with an individual's Meta account, including when the user is logged into Meta while visiting Defendant's Website.

73.    Meta can also link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching" to match users with their Meta accounts. Advanced Matching is either achieved manually or automatically (that is, data is either sent manually by the website developer, or automatically by the pixel identifying recognizable fields, such as name and email address).

24

74.     Importantly, even if there is no match because the user does not have a Meta account, Meta still retains and uses the data collected. These non-users are referred to as having "shadow profiles" with Meta.[9]

75.     Once the data intercepted through the Meta Pixel is processed, the data is available through Meta's Events Manager and Ads Manager pages. Meta also provides the tools and analytics that allow the individuals to be reached again through future advertisements. Developers can use this information to "increase efficiency", "engage users" and "earn money."[10]

76.     In addition to using the data intercepted through Meta Pixel to provide analytics services, Meta also uses the data collected for its own benefit, improving its personalized content delivery, advertising network, and machine-learning algorithms, refining its ability to identify and target users.

77.     Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its open systems and advanced algorithms.

78.     According to leaked internal Meta documents, one employee explained that Meta's systems were built "with open borders." "Imagine you hold

---

[9] Jürgen Graf, Investigating shadow profiles: The data of others, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html. (last visited April 7, 2026).

[10] Audience Network, META, https://www.facebook.com/audiencenetwork (last visited April 7, 2026).

a bottle of ink in your hand. This bottle of ink is a mixture of all kinds of user data (3PD [third-party data], 1PD [first-party data], SCD [sensitive categories data], Europe, etc.)[.] You pour that ink into a lake of water (our open data systems; our open culture) . . . and it flows . . . everywhere . . . How do you put that ink back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?"[11]

79.    In these same leaked documents, another employee explained Meta does "not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.' And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation."[12] Thus, once data is in Meta's possession, there is no way to trace it back, and it is usable for analysis and advertisements, and any other use Meta deigns appropriate. An ounce of prevention is worth a pound of cure – the only way to ensure protected health information ("PHI"), individually identifiably health information ("IIHI"), and personally identifiable information ("PII") is not

---

[11] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does With Your Data, Or Where It Goes: Leaked Document, VICE, (Apr. 26, 2022) https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/ (last visited April 7 2026).

[12] *Id.*

used inappropriately is to not share it without consent in the first instance. No one at Meta can explain where all user data is stored and used.[13]

80.    Website operators can configure pixels to operate only on pages that do not implicate user privacy. Plaintiffs' and Class Members' Private Information would not have been transmitted to Meta but for Defendant's decision to deploy pixels on webpages that solicit and collect sensitive patient information.

81.    Defendant intentionally implemented the Meta Pixel to track user activity for its own commercial benefit, including the capture and disclosure of Private Information without disclosure to or consent from Plaintiffs and Class Members.

82.    At no point before Plaintiffs provided Defendant with their medical symptoms did they consent to their Private Information being disclosed to Meta.

83.    Plaintiffs' and Class Members' Private Information would not have been disclosed to unauthorized third parties but for Defendant's decision to install and operate the Meta Pixel on its Website and servers.

---

[13] Isober Asher Hamilton, Senior Facebook engineers say no one at the company knows where your data is kept, BUSINESS INSIDER, (Sept. 8. 2022) https://www.businessinsider.com/ (last visited April 7, 2026).

27

84.     By installing and implementing the Meta Pixel, Defendant caused Plaintiffs' and Class Members' communications to be intercepted and transmitted from Plaintiffs' and Class Members' browsers directly to Meta via the Pixel.

**A. Defendant Acted to Purposefully Violate HIPAA When It Disclosed Plaintiffs' and Class Members' Private information to Meta using the Pixel.**

85.     Defendant utilizes the Meta Pixel on its Website to secretly track patients by recording their activity and experiences in violation of its common law, contractual, statutory, and regulatory duties and obligations.

86.     The Meta Pixel has its own unique identifiers which can be used to identify which of Defendant's webpages contain the Pixel.

87.     The Meta Pixel allows Defendant to optimize the delivery of ads, measure cross device conversions, create custom audiences, and decrease advertising and marketing costs. However, Defendant's Website does not rely on the Meta Pixel to function.

88.     While seeking and using Defendant's services as a medical provider, Plaintiffs and Class Members communicated their Private Information to Defendant via its Website.

89.     Plaintiffs and Class Members were not aware that their Private Information would be shared with Meta as it was communicated to Defendant because, amongst other things, Defendant did not disclose this fact.

90.   Defendant, like any other "covered entity[,] must obtain an authorization for any use or disclosure of protected health information for marketing." 45 C.F.R. § 164.508(a)(3)(i).

91.   Valid authorization is outlined in 45 C.F.R. § 164.508, and "[w]hen a covered entity obtains or receives a valid authorization for its use or disclosure of protected health information, such use or disclosure must be consistent with such authorization."

92.   One of the requirements for a valid authorization is that "[t]he authorization must be written in plain language." *Id.* at 164.508(c)(3).

93.   In Defendant's "HIPAA Notice of Privacy Practices," which purports to serve as the HIPAA authorization for all activity with Defendant, Defendant steps through its HIPAA duties. Defendant specifically acknowledges the prohibition on using PHI for marketing purposes. Defendant explicitly informs Plaintiffs and Class Members that Defendant "will not share your information for marketing purposes."[14]

94.   At no point does Defendant, in plain language, divulge that Plaintiffs' and Class Members' Private Information will be disclosed to Meta.

---

[14] https://www.berrystreet.co/policy#hipaa (last visited April 7, 2026); *see also* 45 C.F.R. § 164.508(a)(3) ("a covered entity must obtain an authorization for any use or disclosure of protected health information for marketing").

95. As outlined, Defendant publicized its understanding that it is required to protect, and prohibited from disclosing, Plaintiffs' and Class Members' Private Information without valid authorization, especially from use for marketing purposes.

96. By failing to do so, as explained *supra* 106-111, Defendant betrays that its primary motive in disclosing Private Information was to violate HIPAA.

97. Defendant needed to obtain *valid authorization* from Plaintiffs and Class Members to use their Private Information to make money.

98. Defendant failed to take these steps. In so failing, Defendant removed the possibility for Plaintiffs and Class Members to say *no*. At no point were Plaintiffs and Class Members afforded the opportunity to consent to Defendant's profiting off their Private Information.

99. Plaintiffs and Class Members never consented, agreed, authorized, or otherwise permitted Defendant to disclose their Private Information to Meta; nor did they intend for Meta to be a party to their communications (many of them highly sensitive and confidential) with Defendant.

100. The Meta Pixel sent non-public Private Information to Meta, including but not limited to Plaintiffs' and Class Members' chosen provider. Indeed, Plaintiffs' status as patients is itself PHI. The affected non-public Private information includes reasoning for medical treatment.

101. Importantly, alongside the Private Information captured by Meta Pixel was the Plaintiffs' and Class Members' cookies, device identifiers, and IP addresses, thereby allowing individual patients' communications with Defendant, and the Private Information contained in those communications, to be linked to their unique Meta accounts and therefore their identity.

102. Defendant deprived Plaintiffs and Class Members of their privacy rights when it: (1) implemented third-party tracking technology (i.e., the Meta Pixel) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and other online patients' confidential communications and Private Information; (2) disclosed patients' protected information to Meta, an unauthorized third-party; and (3) undertook this pattern of conduct without notifying Plaintiffs or Class Members and without obtaining their express written consent.

103. Defendant does not disclose that the Meta Pixel embedded in the Source Code for the Website tracks and transmits Plaintiffs' and Class Members' Private Information to Meta.

104. Defendant does not disclose that the Meta Pixel installed on the servers for the Website tracks, records, and transmits Plaintiffs' and Class Members' Private Information to Meta.

31

105. Defendant never received consent or written authorization to disclose to Meta the Private Information entered by Plaintiffs and Class Members on the Website.

106. Guidance from the United States Department of Health and Human Services (the "Department") instructs healthcare providers that patient status alone is protected by HIPAA.

107. In "Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule," the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[15]

108. In its guidance for marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization

---

[15]https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited April 7, 2026).

before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[16]

109.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies").

110.    The bulletin expressly provides that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."

111.    In other words, HHS has expressly stated that Defendant has violated HIPAA Rules by implementing the Pixels.

### i.    Plaintiff Jane Doe's Experience

---

[16] https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html  (last visited April 7, 2026).

33

112.   Jane Doe has an account with Meta that contains her personally identifying information.

113.   On or around September 2024, Plaintiff Jane Doe used Defendant's Website to create an account and schedule an appointment with a dietitian.

114.   When Jane Doe scheduled her appointment, Defendant disclosed Jane Doe's PHI to Meta, including Plaintiff's primary  and secondary reasons for visit and the desired medical treatment. Along with this transmission of PHI, Defendant disclosed to Meta information sufficient to allow them to identify Plaintiff as the person scheduling the appointment, including user IDs, cookies, device identifiers, and IP addresses.

115.   Jane Doe has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from further unauthorized disclosure.

### ii.    Plaintiff John Doe's Experience

116.   John Doe has an account with Meta that contains his personally identifying information.

117.   On or around August 2025, Plaintiff John Doe used Defendant's Website to create an account and schedule an appointment with a dietitian.

118.   When John Doe scheduled his appointment, Defendant disclosed John Doe's PHI to Meta, including Plaintiff's primary  and secondary reasons for

visit and the desired medical treatment. Along with this transmission of PHI, Defendant disclosed to Meta information sufficient to allow them to identify John Doe as the person scheduling the appointment, including user IDs, cookies, device identifiers, and IP addresses.

119. John Doe has a continuing interest in ensuring that future communications with Defendant are protected and safeguarded from further unauthorized disclosure.

### iii.    Defendant Violated Industry Standards

120. A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient relationship.

121. The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications.

122. AMA Code of Ethics Opinion 3.1.1 provides:

> Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy)

123. AMA Code of Medical Ethics Opinion 3.2.4 provides:

> Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without

consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

124.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c) release patient information only in keeping ethics guidelines for confidentiality.

### iv.    Plaintiffs' and Class Members' Expectation of Privacy

125.    Plaintiffs and Class Members were aware of Defendant's duty of confidentiality when they sought medical services from Defendant.

126.    Indeed, at all times when Plaintiffs and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with Meta for a commercial purpose, unrelated to patient care.

### v.    IP Addresses, Cookies, and Device Identifiers, in this context, are Individually Identifiable Health Information

127.    Protected health information is "individually identifiable health

36

information" that is maintained or transmitted by electronic media. 45 C.F.R. § 160.103. Individually identifiable health information (IIHI) is (1) health information that is "created or received by a health care provider" that (2) relates to "past, present, or future" health conditions or provision of health care and (3) also either identifies an individual or "there is a reasonable basis to believe the information can be used to identify the individual." *Id.*

128. By using the Meta Pixel on Defendant's Website, Defendant also disclosed and otherwise assisted Meta with intercepting Plaintiffs' and Class Members' computer IP addresses.

129. An IP address is a number that identifies the address of a device connected to the Internet.

130. IP addresses are used to identify and route communications on the Internet.

131. IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

132. Upon information and belief, Meta tracks every IP address ever associated with a Meta user for use of targeting individual homes and their occupants with advertising.

133. Further, Meta associates transmissions with the Meta Pixel with

particular cookies for each Pixel. For example, the Meta Pixel uses "c_user" as explained in ¶ 39.

134.    Meta uses the cookies, IP addresses, and device fingerprints associated with the Pixels to identify users of their services off of their websites, such as on Defendant's website.

135.    When taken together, there is a reasonable basis to believe that the Meta can identify Plaintiffs and Class Members with the transmissions of the Pixels on Defendant's website. Thus, the transmissions of the Pixels on Defendant's website constitute IIHI.

136.    45 C.F.R. § 164.514 (2) lists "Internet Protocol (IP) address numbers," and "[a]ny other unique identifying number, characteristic, or code," as data that cannot be present in health information for that data to be considered "de-identified" and thus "not individually identifiable health information."

> ### vi.    Defendant was Enriched and Benefitted from the Use of the Pixel and Unauthorized Disclosures.

137.    Defendant deployed the Meta Pixel on its Website primarily to evade HIPAA's privacy protections, and secondarily to profit from the collection and transmission of patients' information for marketing and advertising purposes. In exchange for disclosing the Private Information of its patients, Defendant is compensated by Meta in the form of enhanced advertising services and more cost-efficient marketing on its platform.

138. Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

139. By utilizing the Pixels, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

### vii. Plaintiffs' and Class Members' Private Information Had Financial Value.

140. Plaintiffs' data and Private Information has economic value. Meta regularly use data that they acquire to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients. Defendant seeks the benefit of analytics and targeting marketing, which it achieves by working with unauthorized third parties to obtain the data which gets advertised.

141. Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

142. The value of health data in particular is well-known and has been

reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[17]

143.   Similarly, CNBC published an article in 2019 in which it observed that "[d]eidentified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[18]

144.   Further, healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[19]

## TOLLING

145.   Any applicable statute of limitations has been tolled by the "delayed

---

[17] See https://time.com/4588104/medical-data-industry/  (last visited April 7, 2026).

[18] See https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-foryour-health-data.html  (last visited April 7, 2026).

[19] Todd Zigrang & Jessica Bailey-Wheaton, Valuing Healthcare Data, THE VALUE EXAMINER (2023), available online at: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf (last visited April 7, 2026).

discovery" rule. Plaintiffs did not know (and had no way of knowing) that their PII and PHI was intercepted and unlawfully disclosed to third parties because Defendant kept this information secret.

## CLASS ACTION ALLEGATIONS

146. Plaintiffs brings this action on behalf of themselves and on behalf of all other persons similarly situated ("the Class") pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

147. The Class that Plaintiffs seek to represent is initially defined as follows:

> **All individuals residing in the United States who used Defendant's Website and whose Private Information was disclosed to Meta.**

148. Plaintiff Jane Doe seeks to represent a Florida sub-class initially defined as follows:

> **All individuals residing in the State of Florida who are, or were, customers of Defendant and used Defendant's Website.**

149. Plaintiff John Doe seeks to represent a California sub-class initially defined as follows:

> **All individuals residing in the State of California who are, or were, customers of Defendant and used Defendant's Website.**

150. Excluded from the Class are Defendant, its agents, affiliates, parents,

41

subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

151. Plaintiffs reserve the right to modify, amend, expand, or narrow the definition of the proposed class before the Court determines whether certification is appropriate.

152. Numerosity: Fed R. Civ. P. 23(a)(1). The National Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds of thousands of individuals whose PII and PHI may have been improperly disclosed to Meta, and the Class is identifiable within Defendant's records.

153. Commonality: Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

  a. Whether and to what extent Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

  b. Whether Defendant had duties not to disclose the Private Information of Plaintiffs and Class Members to Meta;

42

c. Whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to Meta;

d. Whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

e. Whether Defendant adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

f. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the Private Information of Plaintiffs and Class Members;

g. Whether Defendant violated the consumer protection statutes asserted as claims in this Complaint;

h. Whether Plaintiffs and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of Defendant's disclosure of their Private Information.

154. Typicality: Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims are typical of

43

those of other Class Members because all had their Private Information compromised as a result of Defendant's incorporation of the Pixels due to Defendant's misfeasance.

155. Adequacy: Fed. R. Civ. P. 23(a)(4). Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

156. Superiority and Manageability: Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex

44

claim against a large corporation like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

157.   <u>Policies Generally Applicable to the Class</u>: Fed. R. Civ. P. 23(b)(2). This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

158.   The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs

were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

159. The litigation of the claims is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

160. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

161. Unless a class-wide injunction is issued, Defendant may continue disclosing the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendant may continue to act unlawfully as set forth in this Complaint.

162. Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

163. Issue Certification: Fed. R. Civ. P. 23(c)(4). Likewise, particular issues

are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to, the following:

a. Whether Defendant owed a legal duty to not disclose Plaintiffs' and Class Members' Private Information;

b. Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c. Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d. Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information would be disclosed to third parties;

e. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f.  Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

164.  Plaintiff reserves the right to amend or modify the Class definition as this case progresses.

**COUNT I**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**("ECPA")**
**18 U.S.C. § 2511 *et seq.***
**UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
**(On behalf of Plaintiffs and the National Class, or, Alternatively, the Sub-Classes)**

165.  Plaintiffs incorporate ¶¶ 34-142 ("Factual Allegations") as if fully set forth herein.

166.  ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

167.  The transmissions of Plaintiffs' Private Information to Defendant via Defendant's Website qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(12).

168.  The transmissions of Plaintiffs' Private Information to medical

professionals qualifies as a "communication" under the ECPA's definition in 18 U.S.C. § 2510(2).

169.    **Electronic Communications**. The transmission of Private Information between Plaintiffs and Class Members and Defendant via its Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a  wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

170.    **Content**. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

171.    **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

172.    **Electronic, Mechanical, or Other Device**. The ECPA defines

"electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a. Plaintiffs' and Class Members' browsers;

    b. Plaintiffs' and Class Members' computing devices;

    c. Defendant's web-servers; and

    d. The Meta Pixel deployed by Defendant to effectuate the sending and acquisition of patient communications.

173. By utilizing and embedding the Meta Pixel on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

174. Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the Meta Pixel, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to Meta. These communications include button clicks, provider names, state selected, among other information.

175. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs' and Class Members' regarding PII and PHI and scheduling.

50

176.    By intentionally disclosing or endeavoring to disclose the electronic communications of the Plaintiffs and Class Members to Meta, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

177.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

178.    Plaintiffs and Class Members did not authorize Defendant to acquire the content of the communications for purposes of invading Plaintiffs' privacy via the Meta Pixel.

179.    Any purported consent that Defendant received from Plaintiffs and Class Members was not valid.

180.    **Unauthorized Purpose**. Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications "for the purpose of committing[] criminal or tortious act[s] in violation of the Constitution or laws of the United States or of any State"—namely, invasion of privacy and

51

disclosure of HIPAA-protected PHI without the required consent of Plaintiffs and Class Members, among others.  18 U.S.C. § 2511(2)(d).

181.   **Any party exception in 18 U.S.C. § 2511(2)(d) does not apply**. The party exception in § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

182.   Defendant is a "party to the communication" with respect to patient communications. However, Defendant's simultaneous, unknown duplication, forwarding and disclosure of Plaintiffs' and Class Members' Private Information, separate from the interception of that information, does not qualify for the party exemption.

183.   Defendant violated the Health Insurance Portability and Accountability Act which imposes a criminal penalty for knowingly disclosing individually identifiable health information (IIHI) to a third party. 42 U.S.C. § 1320d-6(a)(3). Plaintiffs' information that Defendant disclosed to third parties qualifies as IIHI.

184.   The penalty for violation is further enhanced where "the offense is

committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." 42 U.S.C. § 1320d-6.

185. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it:

a. Used and caused to be used the cookie identities associated with specific patients without patient authorization; and

b. Disclosed IIHI to Meta without patient authorization.

186. Defendant's conduct would be subject to the enhanced provisions of 42 U.S.C. § 1320d-6 because Defendant's use of the Meta Pixel was for Defendant's commercial advantage to increase revenue from existing patients and gain new patients.

187. Defendant was not "acting under color of law to intercept" Plaintiffs and the Class Member's wire or electronic communication. 18 U.S.C. § 2511(2)(c).

188. Plaintiffs and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiffs' privacy via the Meta Pixel tracking code.

189. Defendant's scheme to defraud in this action consists of: (a) the false and misleading statements and omissions in its privacy policy (HIPAA Notice) set forth above and (b) the placement of the Meta Pixel on its Website.

190. Defendant acted with the intent to defraud in that it willfully invaded

and took Plaintiffs' and Class Members' property rights (a) to the confidentiality of Private Information and their right to determine whether such information remains confidential and exclusive right to determine who may collect and/or use such information for marketing purposes and (b) to determine who has access to their computing devices.

191. As such, Defendant cannot viably claim any exception to ECPA liability.

192. Plaintiffs and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

  a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their individually identifiable patient health information (including information about their medical symptoms, conditions, and concerns, medical appointments, healthcare providers and locations, medications and treatments) for commercial purposes has caused Plaintiffs and the Class Members to suffer emotional distress;

  b. Defendant received substantial financial benefits from its use of Plaintiffs' and Class Members' individually identifiable patient health information without providing any value or benefit to Plaintiffs or the Class Members;

54

c. Defendant received substantial, quantifiable value from its use of Plaintiffs' and Class Members' individually identifiable patient health information, such as understanding how people use its Website and determining what ads people see on its website, without providing any value or benefit to Plaintiffs or the Class Members;

d. Defendant has failed to provide Plaintiffs and the Class Members with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information; and

e. The diminution in value of Plaintiffs' and Class Members' PII and PHI and the loss of privacy due to Defendant making sensitive and confidential information, such as patient status, medical symptoms, and appointments that Plaintiffs and Class Members intended to remain private no longer private.

193. As a result of Defendant's violation of the ECPA, Plaintiffs and Class Members are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs

## COUNT II
## NEGLIGENCE AND NEGLIGENCE PER SE
### (On behalf of Plaintiffs and the National Class, or, Alternatively, the Sub-Classes)

194. Plaintiffs incorporate ¶¶ 34-142 ("Factual Allegations") as if fully set forth herein.

195. Defendant encouraged and/or required Plaintiffs and Class members to submit Private Information to obtain healthcare services.

196. Upon accepting, storing and controlling the Private Information of Plaintiffs' and Class Members' in its computer systems, Defendant owed, and continue to owe, a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information from disclosure to third parties.

197. Defendant otherwise owed Plaintiffs and Class Members a duty to exercise reasonable care in handling, securing, and safeguarding their Private Information in violation of the confidential relationship between healthcare providers and patients; the sensitive nature of the Private Information; federal and state statutes , including HIPAA and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(n)); and industry standards and professional codes of conduct.

198. Defendant otherwise owed Plaintiffs and Class Members a duty to exercise reasonable care in handling, securing, and safeguarding their Private Information in violation of the confidential relationship between healthcare

providers and patients; the sensitive nature of the Private Information; federal and state statutes[20], including HIPAA and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45(n)); and industry standards and professional codes of conduct.

199. Defendant breached its duty of care by installing and implementing the Meta Pixel on their Website, knowing that such technologies would disclose Plaintiffs' and Class Members' Private Information to Meta without authorization, and knowing that Meta would identify specific individuals and link their Private Information to their personal identities.

200. Defendant otherwise breached this duty by failing to exercise

---

[20] See, e.g., Alabama: Ala. Code § 34-22-83(d)(1); Arizona: Ariz. Rev. Stat. Ann. § 36-3602(B); Ariz. Rev. Stat. Ann. § 12-2292(A); see Ariz. Rev. Stat. Ann. § 12-2291; Ariz. Rev. Stat. Ann. § 12-2294; Arkansas: Ark. Code Ann. § 17-80-404 (e)(2)-(3); California: Cal. Bus. & Prof. Code § 2290.5(f); Colorado: Colo. Rev. Stat. Ann. § 12-30-124 (6); Delaware: Del. Code. Ann. tit. 6, §12B-100; Florida: Fla. Stat. Ann. § 456.47(3); Fla. Stat. § 456.057(10); Georgia: O.C.G.A. §§ 31-33-2, 31-33-8; Illinois: 225 Ill. Comp. Stat. Ann. 150/15(b); Indiana: Ind. Code Ann. § 25-1-9.5-7 (d); Ind. Code Ann. § 16-39-5-3; Kansas: Kan. Stat. Ann. § 65-6825(a); Kentucky: Ky. Rev. Stat. Ann. § 310.200 (1)(b); Louisiana: La. Stat. Ann. § 40:1223.4(B)(1); Maine: Me. Rev. Stat. Ann. tit. 32, § 9916 (3); Maryland: Md. Code Ann., Health-Gen. § 4-302 (a)(1); Minnesota: Minn. Stat. Ann. § 144.293; Montana: Mont. Code Ann. § 50-16-525; Nebraska: Neb. Rev. Stat. Ann. § 71-8505; Nevada: Nev. Rev. Stat. Ann. § 439.589; New Hampshire: N.H. Rev. Stat. Ann. § 332-I:2; New Jersey: N.J. Stat. Ann. § 45:1-62 (g); New Mexico: N.M. Stat. Ann. § 24-25-4; Ohio: Ohio Rev. Code Ann. § 4743.09 (3)(m); Ohio Admin. Code 5122-29-31(K); Oklahoma: Okla. Stat. Ann. tit. 59, § 478.1 (B); South Carolina: S.C. Code Ann. § 40-42-20 (A)(3); South Dakota: S.D. Codified Laws § 34-52-8 (3); Tennessee: Tenn. Code Ann. § 63-2-101(b)(1)(A); Texas: Tex. Occ. Code Ann. § 111.003; Washington: Wash. Rev. Code Ann. § 18.134.040 (1); Wisconsin: Wis. Stat. Ann. § 146.816; Wyoming: Wyo. Stat. Ann. § 33-47-109.

reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

201. It was reasonably foreseeable that Defendant's failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information through its use of the Meta Pixel would result Meta gaining access to such Private Information for no lawful purpose.

202. Defendant's breach of its duty of care was the proximate cause of injuries and damages to Plaintiffs and Class Members.

203. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered damages, including invasion of privacy and loss of confidentiality of their Private Information; loss of the benefit of their bargain; diminution in value of their Private Information; continuing risk to their Private Information; increased infiltrations into their privacy through spam and targeted advertising they did not ask for; and loss of privacy, confidentiality, embarrassment, emotional distress, humiliation, and enjoyment of life.

204. Plaintiffs and Class Members are entitled to compensatory damages in an amount to be determined at trial.

## COUNT III
## BREACH OF FIDUCIARY DUTY
**(On behalf of Plaintiffs and the National Class, or, Alternatively, the Sub-Classes)**

205. Plaintiffs incorporate ¶¶ 34-142 ("Factual Allegations") as if fully set

forth herein.

206.   In light of the special relationship between Defendant and Plaintiffs and Class Members, whereby Defendant became a guardian of Plaintiffs' and Class Members' Private Information, Defendant became a fiduciary by their undertaking and guardianship of Private Information, to act primarily for Plaintiffs and Class Members:

     a. for the safeguarding of Plaintiffs' and Class Members' Private Information;

     b. to timely notify Plaintiffs and Class Members of an unauthorized disclosure; and

     c. to maintain complete and accurate records of what information (and where) Defendant did and do store.

207.   Defendant has a fiduciary duty to act for the benefit of Plaintiffs and Class Members upon matters within the scope of Defendant's relationship with their patients and former patients, in particular, to keep secure their Private Information.

208.   Defendant breached its fiduciary duties to Plaintiffs and Class Members by disclosing their Private Information to Meta, and separately, by failing to notify Plaintiffs and Class Members of this fact.

209.   Defendant's breach of fiduciary duty was a legal cause of damage to

Plaintiffs and Class Members.

210. But for Defendant's breach of fiduciary duty, the damage to Plaintiffs and Class Members would not have occurred.

211. As a direct and proximate result of Defendant's breach of their fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages and disgorgement of ill-gotten gains, in an amount to be proven at trial.

**COUNT IV**
**BREACH OF CONFIDENCE**
**(On behalf of Plaintiffs and the National Class, or, Alternatively, the Sub-Classes)**

212. Plaintiffs incorporate ¶¶ 34-142 ("Factual Allegations") as if fully set forth herein. Medical providers have a duty to their patients to keep non-public medical information completely confidential.

213. Defendant disclosed Plaintiffs' and Class Members' Private Information to Meta without Plaintiffs' or Class Members' knowledge, consent, or authorization, and were unprivileged.

214. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

215. As a direct and proximate cause of Defendant's unauthorized

disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiffs and Class Members were damaged by Defendant's breach in that:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Plaintiffs and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c. Defendant eroded the essential confidential nature of the provider-patient relationship;

d. General damages for invasion of their rights in an amount to be determined by a jury;

e. Nominal damages for each independent violation;

f. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without compensation for such data;

g. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality;

h.  Defendant's actions diminished the value of Plaintiffs' and Class Members' Private Information; and

i.  Defendant's actions violated the property rights Plaintiffs and Class members have in their Private Information.

## COUNT V
## BREACH OF IMPLIED CONTRACT
**(On behalf of Plaintiffs and the National Class, or, Alternatively, the Sub-Classes)**

216.  Plaintiffs incorporate ¶¶ 34-142 ("Factual Allegations") as if fully set forth herein. As a condition of utilizing Defendant's digital platforms and receiving services from Defendant, Plaintiffs and the Class provided their Private Information and compensation for their medical care.

217.  When Plaintiffs and Class Members provided their Private Information to Defendant they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Private Information without consent.

218.  Plaintiffs and Class Members would not have entrusted Defendant with their Private Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Private Information without consent.

219.  Defendant breached these implied contracts by disclosing Plaintiffs' and Class Members' Private Information without consent to Meta.

220. As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiffs and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of Private Information.

221. Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Defendant's breach of implied contract.

## COUNT VI
## UNJUST ENRICHMENT
### (On behalf of Plaintiffs and the National Class, or, Alternatively, the Sub-Classes)

222. Plaintiffs incorporate ¶¶ 34-142 ("Factual Allegations") as if fully set forth herein. Defendant benefits from the use of Plaintiffs' and Class Members' Private Information and unjustly retained those benefits at their expense.

223. Plaintiffs and Class Members conferred a benefit upon Defendant in the form of Private Information that Defendant collected from Plaintiffs and Class Members, without authorization and proper compensation. Defendant consciously and voluntarily collected and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

224. Defendant unjustly retained those benefits at the expense of Plaintiffs

and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

225.    The benefits that Defendant derived from Plaintiffs and Class Members was not offered by Plaintiffs and Class Members gratuitously and rightly belongs to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles in Florida and every other state for Defendant to be permitted to retain any of the profit or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

226.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VII**
**INVASION OF PRIVACY**
**(On behalf of Plaintiffs and the National Class, or, Alternatively, the Sub-Classes)**

227.    Plaintiffs incorporate ¶¶ 34-142 ("Factual Allegations") as if fully set forth herein. The Private Information of Plaintiffs and Class Members consists of private and confidential facts and information that was never intended to be shared beyond private communications.

64

228. Defendant owed a duty to Plaintiffs and Class Members to keep their Private Information confidential.

229. Defendant's unauthorized disclosure of Plaintiffs' and Class Members' Private Information to Meta is highly offensive to a reasonable person.

230. Defendant's willful and intentional disclosure of Plaintiffs' and Class Members' Private Information constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

231. Defendant's conduct constitutes an intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Defendant facilitated Meta's simultaneous eavesdropping and wiretapping of confidential communications.

232. Defendant failed to protect Plaintiffs' and Class Members' Private Information and acted knowingly when it installed the Meta Pixel because the purpose of the third-party tracking tools is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

233. Because Defendant intentionally and willfully incorporated the Meta

Pixel into its Website and encouraged patients to use that Website for healthcare purposes, Defendant had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

234.    As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiffs and the Class Members was disclosed to a third party without authorization, causing Plaintiffs and the Class to suffer damages.

235.    Plaintiffs, on behalf of themselves and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs.

236.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendant and is still in the possession of Meta and the wrongful disclosure of the information cannot be undone.

237.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not undo Defendant's disclosure of the information to Meta who on information and belief, continue to possess and utilize that information.

238. Plaintiffs, on behalf of themselves and Class Members, further seeks injunctive relief to enjoin Defendant from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

## COUNT VIII
## VIOLATIONS OF THE FLORIDA SECURITY COMMUNICATIONS ACT
## Fla. Stat. § 934.01, et. seq.
## (On Behalf of Plaintiff Jane Doe and the Florida Sub-Class Members)

239. Plaintiff Jane Doe incorporates ¶¶ 34-142 ("Factual Allegations") as if fully set forth herein.

240. The Florida Secretary of Communications Act ("FSCA") is codified at Florida Statutes, § 934.01, et seq. The FSCA begins with legislative findings, including:

> On the basis of its own investigations and of published studies, the Legislature makes the following findings…(4) to safeguard the privacy of innocent persons, the interception of wire or oral communications when none of the parties to the communications has consented to the interceptions should be allowed only when authorized by a court of competent jurisdiction and should remain under the control and supervision of the authorizing court.

241. Florida Statutes § 934.10 provides, in pertinent part, as follows.

> Any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of §§ 934.04-934.09 shall have a civil cause of action against any person or entity who intercepts, discloses, or uses, or procures any person or entity to intercept, disclose, or use, such communications and shall be entitled to recover from any

such person or entity which engaged in that violation such relief as may be appropriate, including: (a) [p]reliminary or equitable declaratory relief as may be appropriate; (b) [a]ctual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of the violation or $1,0000, whichever is higher; (c) [p]unitive damages; and (d) [a] reasonable attorney's fee and other litigation costs reasonably incurred.

242. The FCSA defines "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in party by a wire, radio, electromagnetic, photoelectronic, or photo-optical systems that affects intrastate, interstate, or foreign commerce." Fla. Stat. § 934.02(12). It further defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3).

243. The FSCA defines "electronic communication" broadly as any transfer of data transmitted in whole or in part by wire, radio, or other electronic systems affecting interstate or intrastate commerce. Fla. Stat. § 934.02(12). Unlike "oral communication," which requires that the speaker exhibit a reasonable expectation of privacy, the statute's definition of "electronic communication" contains no such requirement. *Compare* Fla. Stat. § 934.02(12), *with* § 934.02(2). Accordingly, liability under the FSCA for the interception of electronic communications does not depend on whether a plaintiff can demonstrate a reasonable expectation of privacy.

244. In any event, even if such a showing were required, Jane Doe and the Florida Sub-Class Members had a reasonable expectation that their communications with Defendant, particularly those involving medical information, treatment inquiries, and appointment scheduling, would remain private. Medical and health-related information is among the most sensitive categories of personal data, and individuals reasonably expect that such information, when disclosed to a healthcare provider, will not be intercepted or shared with third parties for unrelated commercial purposes.

245. At all relevant times, Defendant aided, employed, agreed with, and conspired with Meta to intercept Jane Doe's and Florida Sub-Class Members' internet communications while accessing the Website, including the contents thereof—i.e., the URL visited, the medical conditions and types of treatment selected. Such information not only constitutes protected health information, but it also represents the substance, import, and meaning of the communications between Jane Doe and other Florida Sub-Class Members had with Defendant's Website.

246. Jane Doe and other Florida Sub-Class Members had a reasonable expectation of privacy in the electronic communications they had with Defendant's Website. Defendant had given no indication given that Jane Doe's and Florida Sub-Class Members' Private Information would be shared with others

other than that required by law or for medical care. The application of the Meta Pixel is not required by law or necessary for medical care.

247. Nonetheless, these electronic communications were transmitted to and intercepted by Meta during the communication and without knowledge, authorization, or consent of Jane Doe and Florida Sub-Class Members. That is because Defendant intentionally inserted an electronic device into its website that, without the knowledge and consent of Jane Doe and Florida Sub-Class Members, recorded and transmitted the substance of their confidential communications with Defendant to Meta.

248. Defendant willingly facilitated Meta's interception and collection of Plaintiffs' and Class Members' Private Information by embedding the Meta Pixel on its Website.

249. Defendant used the following items as a device or apparatus to intercept wire, electronic, or oral communications made by Jane Doe and other Florida Sub-Class Members:

      a. The computer codes and programs Meta used to track Jane Doe's and Florida Sub-Class Members' communications while they were navigating the Website;

      b. Jane Doe's and Florida Sub-Class Members' browsers;

c. Jane Doe's and Florida Sub-Class Members' computing and mobile devices;

d. Meta's web and ad servers;

e. The web and ad-servers from which Meta tracked and intercepted Jane Doe's and Florida Sub-Class Members' communications while they were using a web browser to access or navigate the Website;

f. The computer codes and programs used by Meta to effectuate its tracking and interception of Jane Doe's and Florida Sub-Class Members' communications while they were using a browser to visit Defendant's website; and

250. Defendant failed to disclose that it is using the Meta Pixel specifically to track and automatically and simultaneously transmit communications to Meta.

251. To avoid liability under the FCSA, a defendant must show it had the consent of *all* parties to a communication.

252. The patient communication information that Defendant transmits while using the Meta Pixel; such as doctor appointment booking information and names, IP addresses, and home addresses constitutes protected health information.

253. As demonstrated hereinabove, Defendant violates the FCSA by

aiding and permitting Meta to receive its patients' online communications in real time through its Website without their consent.

254.    By disclosing Jane Doe's and Florida Sub-Class Members' Private Information, Defendant violated Jane Doe's and Florida Sub-Class Members' statutorily protected privacy rights.

255.    As a result of the above violations and pursuant to Florida Statute, § 934.10, Jane Doe's and Florida Sub-Class Members' are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

256.    Under the statute, Defendant is also liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## COUNT IX
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT
### Cal. Penal Code §§ 630, *et seq..*
### (On Behalf of Plaintiff John Doe and the California Sub-Class Members)

257.    Plaintiff John Doe incorporates ¶¶ 34-142 ("Factual Allegations") as if fully set forth herein.

258.    The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code §§ 630 to 638.

259.    CIPA begins with its statement of purpose:

72

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Penal Code §§ 630

> California Penal Code § 631(a) provides, in pertinent part: Any person  who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars ($2,500)[.]

260.    A defendant must show it had the consent of *all* parties to a communication. Defendant cannot do so here.

261.    At all relevant times, Defendant knowingly and intentionally disclosed John Doe's and California Sub-Class Members' communications to Meta. and by installing and configuring the Meta Pixel on its Website.

262.    Through this implementation, Defendant affirmatively caused John

Doe's and California Sub-Class Members' communications—including the substance of their interactions with Defendant's Website—to be transmitted in real time to Meta. These communications included Private Information, such as highly sensitive PHI.

263. Defendant did not merely permit passive collection. Rather, Defendant configured its Website to send, duplicate, and disclose the contents of users' communications directly to Meta at the moment those communications were made.

264. This disclosure occurred without the knowledge, authorization, or consent of John Doe and California Sub-Class Members. At no point did Defendant obtain consent from all parties to the communication.

265. Defendant intentionally embedded tracking technologies—constituting "machine[s], instrument[s], or contrivance[s]" under CIPA—into its Website to facilitate the transmission of these communications to Meta and other third parties.

266. By doing so, Defendant knowingly and willingly provided Meta with access to, and possession of, John Doe's and California Sub-Class Members' confidential communications, thereby enabling Meta to collect, process, and use that information for its own purposes, including targeted advertising.

267. Defendant failed to disclose that it would share and transmit these

74

highly sensitive communications to third parties. To the contrary, Defendant represented that such information would remain confidential.

268. The information disclosed by Defendant constitutes protected health information and other private data entitled to statutory protection.

269. By disclosing John Doe's and California Sub-Class Members' communications to Meta and other third parties without consent, Defendant violated John Doe's and California Sub-Class Members' statutorily protected right to privacy under CIPA.

270. As a result of the above violations and pursuant to CIPA Section 637.2, Defendant is liable to John Doe and California Sub-Class Members for treble actual damages related to their loss of privacy in an amount to be determined at trial, or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[i]t is not a necessary prerequisite to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

271. Under the statute, Defendant is also liable for reasonable attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying the National Class and the Sub-Classes and appointing Plaintiffs and Counsel to represent the Classes;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct alleged in this Complaint pertaining to the misuse and/or disclosure of the Private Information of Plaintiffs and Class Members;

C. For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members;

D. For an award of damages, including, but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

E. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. For prejudgment interest on all amounts awarded; and,

G. Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

DATE: April 9, 2026                    Respectfully Submitted,

     /s/ Jimmy Mintz

Jimmy Mintz (FL Bar No. 113363)
**BRYSON HARRIS SUCIU &**
**DEMAY PLLC**
201 Sevilla Avenue, Suite 200
Coral Gables, FL 33134
Tel.: (786) 879-8200
jmintz@brysonpllc.com

Thomas Bibby*
**BRYSON HARRIS SUCIU &**
**DEMAY PLLC**
900 W Morgan Street
Raleigh, NC 27603
Phone: (610) 500-4546
tbibby@brysonpllc.com

*Pro Hac Vice Pending*